Joseph CARENZA, (Plaintiff) Appellant,

v.

VULCAN–CINCINNATI, INC., and Employers Liability Insurance Corp., (Defendants) Respondents.

No. 31017.

St. Louis Court of Appeals.

Missouri.

May 21, 1963.

James J. Butler, and Hough, Herrmann, Nichols, Hormberg & Filippine, Clayton, for appellant.

Robert W. Herr, and Luke, Cunliff & Wilson, St. Louis, for respondents.

J. P. MORGAN, Special Commissioner.

This is an appeal by Joseph Carenza, employee, from a judgment of the Circuit Court of Pike County affirming for him a final award of the Industrial Commission in the amount of $5,600.00, based on a finding of 40% permanent partial disability to his body as a whole, or 160 weeks of compensation at $35.00 per week.

Appellant's allegations of error listed in their logical sequence are: (1) The Industrial Commission, although requested to do so, failed to make specific findings of fact

as to each injury to claimant's wrist, arm, elbow, shoulder and back and failed to state, as requested, the related partial permanent disability attributed to each such individual injury; (2) The award of the Industrial Commission relating to permanent partial disability was insufficient and against the overwhelming weight of the evidence; and (3) The Industrial Commission failed to award plaintiff payment, or give him credit for a "healing period" of 20 weeks' duration. The latter apparently creating a question of first impression.

From the agreed facts, it is found that on April 26, 1957, claimant was employed by Vulcan-Cincinnati, Inc. as a journeyman boilermaker in the City of Louisiana, Missouri. His immediate task was to cut the guard or railing on a tower so that damaged portions might be straightened and re-welded into position. In preparing to lower one portion to the ground, he stepped onto the roof of an adjoining building. When the roof gave way and caved in, he fell some 25 to 30 feet to the floor surface, which fortunately consisted of freshly poured concrete. Claimant testified he recalled hitting both arms in his efforts to break his fall. Dr. E. A. Cunningham was called and found claimant impaled upon the end of a two-by-four used for forms. It struck below the left scapula and passed upward beneath the scapula on the outside of the rib-cage. Upon arrival at the Pike County Hospital, Dr. Cunningham's diagnosis was in brief as follows: "Fracture of the 4th rib, left, posteriorly, with probable fractures of 2nd and 3rd ribs; severe lacerations, under left scapula, extending upward beneath the scapula; severance of latissimus dorsi, longissimus dorsi muscles, lumbo dorsal fascia, and the external intercostal muscles; comminuted fracture, left scapula; dislocation, right humerus at the shoulder, reduced; fracture, comminuted, dislocation, left wrist, almost compound; severe contusion, left thigh; laceration, left thigh, and shock, moderate." The dislocation of the humerus at the right shoulder was reduced, as well as the fractured dislocation of the left wrist with cast applied, and other lacerations were drained and closed by sutures.

On April 30, 1957, claimant was transferred to the Barnes Hospital in St. Louis under the care of Dr. H. R. McCarroll. His personal observation and review of x-rays revealed a fracture through the neck of the scapula, on the right, in which the position remained good; the dislocation of the right shoulder to be properly reduced and in good position; a comminuted fracture of the neck of the scapula, on the left, in which there was displacement of the multiple fragments; a comminuted fracture of the distal portion of the ulna and radius of the left forearm and wrist; no evidence of fracture in the dorsal and lumbar portions of the spine except fracture of one rib on left side. (Fractured elbow found later.)

On May 4, 1957, a displacement of the fracture of the distal end of the radius and ulna was realigned and a new cast applied. Sutures closing the laceration over the left side of the thorax were removed and the wound healed. He was discharged on May 11, 1957, but readmitted on September 17, 1957, when surgery was performed with reference to an area of irregularity in the left scapula requiring amputation of the distal one-third of the body of the scapula (two and one-half inches) to remove a clicking in the movement of the scapula over the thoracic cage. Out patient treatment continued until October 28, 1957, at which time claimant was released for some form of work. Claimant testified he was unable to perform his past duties and sought employment as a salesman of office equipment.

Dr. McCarroll re-examined claimant on February 24, 1958, and testified:

That he had shown gradual improvement and returned to work as a salesman; his complaints generally pertained to his left wrist, elbow and shoulder, with the greatest pain occurring when he turned to his left side in sleeping, as well as a pulling

sensation in the upper chest when turning the steering wheel of his car; that a casual observance with his clothes on revealed no gross outward evidence of deformity. In standing erect the left shoulder was held slightly lower than the right; there was good musculature about both shoulders and shoulder girdle, but the musculature on the right is a little better developed than on the left; good function could be demonstrated in the trapezius muscle on each side; diffused tenderness of pressure about the right shoulder and over entire area of left scapula; some depression in the scar from the operation on the left scapula resulting from contraction of underlying soft tissues; tenderness over the left thoracic cage and mid-axillary line extending along this scar; on moving the scapula on each side actively over the thoracic cage, no marked crepitus could be felt, although a mild amount was felt at times on the left; he demonstrated good muscle power about the left shoulder, but the musculature of the left upper extremity was not quite as heavy as that on the right side; he is a right-handed individual which could account for some of that; some of it could be due to the difference in motion on the two sides. The examination of the left elbow revealed: flexion deformity of 15 degrees from which point active flexion was possible to 145 degrees; rotations of the left forearm remained very good with slight limitation at the extreme of each of these motions; a very little crepitus was felt on these motions at the head of the radius at the level of the elbow; some tenderness about the entire left elbow joint and a little thickening over the posterior aspect with no joint effusion and no adjacent soft tisue edema; forcing the left forearm in pronation and supination passively caused complaint of pain. Examination of left wrist revealed: moderate amount of diffuse soft tissue thickening and a little bony fullness over dorsal surface of distal end of radius; flexing of left wrist same as right, with extension from straight line of 60 degrees as compared to 75 degrees

of right wrist. In the left hand he had good motion of the digits and was able to close a complete fist with just a little bit of slight limitation as compared with the right. The motions of the back seemed to be normal and his chest expansion measured four inches.

The x-rays taken at this time were interpreted as showing: right shoulder revealed bone and joint structures to be normal except for a mild degree of irregularity at the inferior margin of the glenoid process and a mild degree of irregularity at the superior and outer margin of the head of the humerus; in the left shoulder there was no abnormality in relation to the shoulder joint itself; some irregularity in the left scapula and distal portion absent as result of surgical removal; lateral view of the left scapula showed a marked degree of irregularity throughout as a result of the old healed fractures with the fracture lines no longer visible; the left thoracic cage revealed satisfactory rib structures with no visible fracture; the left elbow had a moderate irregularity of the articular surface of the radial head where the original fracture had occurred and which was relatively displaced and the fracture appeared to be well healed; the left wrist had considerable irregularity as a result of the original comminuted fracture which involved the distal portion of the radius; the general alignment remained good, but some of the healed fracture lines were visible; there was a marked degree of irregularity of the articular surface of the distal end of the radius along its inner surface with a moderate amount of bony debris opposite the distal end of the ulna, and some irregularity of the adjacent styloid process.

From this record, Dr. McCarroll testified that, in his opinion, the residual disability of claimant was approximately 10 per cent of the individual as a whole, plus an additional 5 per cent of the right upper extremity at the shoulder plus 25 per cent of the left upper extremity at the shoulder; the rating as to the left arm at the shoulder

taking into consideration the disability at both the elbow and wrist.

The last examination approximately two years later was on January 15, 1960. The doctor said there was little change in his condition except some improvement noted in his left elbow, but some showing of arthritis in the wrist joint. At this examination claimant said he had twice dislocated his right shoulder since the last report. The doctor could not confirm this claim but stated that if this were true, the disability rating at the right shoulder perhaps should be 15% instead of 5%. Claimant inquired as to the doctor's opinion of disability at each level of the left arm, independent of any other injury, and brought out these opinions with each rated separately; 20% at wrist, 10% at elbow and 20% at shoulder.

Claimant was examined in October, 1958, by Dr. Joseph E. Flynn, and his deposition is in the record. However, there could be no advantage in extending this opinion by outlining his findings as they are substantially the same as those of Dr. McCarroll already detailed, except for some variance in phraseology and estimates of disability, which Dr. Flynn placed at: 40% of the left upper extremity at shoulder; 20% at left elbow; 25% left wrist; 15% of right upper extremity at shoulder and 10% of body as whole. He further testified that prior to making these estimates of permanent partial disability that he had not been advised of previous injuries suffered by claimant.

By stipulation records of prior compensation claims of Mr. Carenza were admitted: (1) On October 16, 1953, while working for United Engineers and Constructors, Inc. in St. Louis County he "slipped while tightening a ratchet wrench and fell on his left arm," and by compromise a lump sum settlement of $1484.00 was paid; (2) On December 14, 1956, while working for Kaiser Engineers in Cape Girardeau County his claim form stated, "while claimant was engaged in his regular duties he fell off scaffold causing or aggravating above described injuries (left leg and left arm)", and by compromise a lump sum settlement of $1400.00 was paid. Their interest here being limited to the ratings given in that both, to some extent, involved claimant's left arm, and the effect, if any, they might have had on Dr. Flynn's ratings.

It was shown that claimant had been a well known soccer player and was an alternate on the 1952 United States Soccer Team. During 1958, the year after this accident, he tried to play in 4 to 6 games with established teams but had to quit, and as he testified, " * * * I worked out with them a little bit and after I played a few games then I told them that that was it * * *." At the time of the hearing, claimant was donating his time about three nights a week in coaching soccer at Washington University in St. Louis. He stated his participation in the workouts was limited, but in coaching had demonstrated such skills as how to pass a ball by kicking with the inside of the foot. He was unable to continue his work as a boilermaker and was presently engaged in selling office equipment and supplies. He did not think there had been much improvement in his condition, and that his pains were persistent, especially when trying to do anything requiring him to reach above his head.

From this medical record, the final award of the Industrial Commission was made. Its factual findings included all twenty-three items printed on its accepted forms (Final Award with attached Findings of Fact). In view of stipulations, the only finding in question is item 12: "Parts of body injured by accident: Left upper extremity, both shoulders, back, left thigh and body as a whole," plus the following additional findings:

"The Commission finds from the evidence that on April 26, 1957, employee herein sustained an accidental injury arising out of and in the course of his employment with employer here-

in which resulted in injury to his arms, shoulders, back, legs and body as a whole.

"We further find that the employee was temporarily and totally disabled for 28% weeks, for which compensation has been paid to the employee by the employer and insurer at the agreed compensation rate of $35.00 per week for a total of $1,010.00. Employee is not entitled to any healing period.

"We further find that as a result of the accidental injury aforesaid (and disregarding any prior disability the employee may have had), the employee has sustained permanent partial disability amounting to 40 per cent of the body as a whole, which entitled him to receive from the employer and insurer compensation for 160 weeks at $35.00 per week or $5,600.00, subject to a credit for $1,010.00 previously paid as aforesaid, or $4,590.00 additional."

■ Claimant contends that the Commission erred in not setting out specific findings of fact relative to each injury and resultant per cent of disability attributed to every individual injury, i. e., left wrist, left elbow, back and shoulders, prior to its ultimate finding that the employee sustained permanent partial disability amounting to 40 per cent of the body as a whole. This complaint and further request that this court determine and set out each of such specific findings is dependent upon a determination as to whether or not the findings of the Commission were inadequate in the first instance. However, it should first be noted that he did not file any motion or request with the Commission asking that its findings be amplified. Collins v. Reed-Harlin Grocery Co., Mo.App., 230 S.W.2d 880 and cases therein cited. Although not thought sufficient, since claimant did in the argumentative portion of his Application for Review of the Referee's Award make a similar complaint, this point will be determined as if the Commission refused or

ignored a proper request for additional findings.

In Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S.W.2d 601, at page 604, the court while discussing the statutory requirement as to findings of facts, stated: "This provision evidently contemplates that the facts to be found and embodied in a statement shall be the ultimate constitutive facts upon which the award can be predicated as a conclusion of law. From such statement facts which are merely evidentiary in character should, therefore, be excluded." Again in the more recent case of Groce v. Pyle, Mo.App., 315 S.W.2d 482, l. c. 490, the court stated:

"Findings of fact are required by Sections 287.460 and 287.490 RS Mo. 1949, V.A.M.S. One of the questions on appeal, as provided by Section 287.490, is whether the facts found by the Commission support the award. The findings of fact should be sufficient to show how the controlling issues have been decided. Otherwise, the reviewing court will be unable to know what the Commission has really determined in order that it may know what to review, and whether or not correct rules of law have been applied to facts which could properly be found on the particular record. (Citing cases) * * The Commission is not required to state the evidentiary facts upon which its ultimate findings may depend."

■ In the instant case, all factual questions were stipulated except as to the extent of the injury. From the Commission's findings already set out, it is shown that this question was determined as the basis for the award. It is sufficient for any court on review to decide whether or not the finding was supported by substantial evidence. To require that the finding as to extent of disability in any case involving multiple injuries be detailed as to each portion of each extremity, as well as those bodily injuries not scheduled by statute,

would be unduly burdensome and would constitute a recitation of evidentiary facts.

Claimant quotes at length from the opinion of this court in Ludwig v. Columbia Brewing Co., Mo.App. 225 S.W.2d 489, as requiring a finding of extent of disability as to each specific injury. That case involved injuries to one extremity—the left arm, and evidence of a 50% disability at the elbow and 30% at the shoulder. The court found it to be an injury calling for a scheduled amount of compensation and states, "Both injuries mentioned therefore should have been considered as partial permanent disability to the arm and the extent to which the arm was disabled should have been stated." The court there did not require a finding of disability as to each specific portion of the arm, nor is it necessary in a case of multiple injury to several different areas of the body as in the instant case. Claimant's contention here is identical with that made in Dauster v. Star Mfg. Co., Mo.App., 145 S.W.2d 499, 501 decided by this court. The employee had suffered an injury to each leg and the Commission made an award based on a finding of disability to the man as a whole. A portion of appellant's brief was quoted and contained the following:

"In its findings, however, the Commission failed to decide how much disability the claimant sustained in each leg, and only found that he lost 75 per cent of his ability to work and function as a normal man. It is appellant's contention that such a finding is necessary to support any award in this case. * * * Since the Commission made no finding as to the separate loss of use of each leg, there is no conclusive finding on this important issue."

Such a requirement was not made, as may also be seen in the later cases of Chapman v. Raftery, Mo.App., 174 S.W.2d 352 and Teel v. F. Burkhart Mfg. Co., Mo.App., 271 S.W.2d 259. The findings in the instant case are sufficient for all required purposes.

Claimant next contends that the award was insufficient and against the overwhelming weight of the evidence, the argument on this point being limited to the suggestion that the final award will appear grossly inadequate if each specific injury shown is considered. This contention is apparently based on a portion of his argument on Point I wherein claimant stated, " * * * the cross-examination was addressed toward a pointed inquiry concerning the breakdown of plaintiff's rated disability, according to Dr. McCarroll, of the left extremity in an effort to clearly demonstrate that this disability rating should have been the result of not the overall minimum disability of the extremity as a whole, *but the sum total of the individual and particular disabilities of its component parts."* This argument ignores the testimony of claimant's treating doctor who testified:

"Q. Now with reference to this disability for the left upper extremity of the left shoulder * * *, did that take into account not only the actual findings at the level of the shoulder, but also the findings at the elbow and at the wrist on the left side in arriving at a total disability for the entire member of 25%?

"A. That is correct. I gave it on the extremity as a whole taking them all into consideration."

The fallacy of this approach is evident if one were to assume an injury with any per cent of disability greater than 60% at both the wrist and elbow, and by using the allowances set out in Section 287.190, it would be found that the sum of the two would exceed the allowance for the severance of the entire arm at the shoulder. The scheduled ratings are not to be so applied. Ludwig v. Columbia Brewing Co., supra, and cases therein cited. As stated in Darghe v. Blackburn Const. Co., Mo.App., 53 S.W.2d 1088, 1. c. 1090, "The compensation to be allowed was for a disability resulting from several distinct injuries, and therefore the award was prop-

erly based upon the scheduled compensation for the greater injury, that is, the injury to the hand as a whole, rather than for the injuries to the component parts." The employer has set out in its brief an extended application of the ratings of disability given to the statutory allowances which need not be detailed as any mathematical approach shows the award to be in a range between the ratings of Dr. McCarroll and Dr. Flynn. In any event, the Commission was not bound conclusively by the percentage estimate of the doctors, Barron v. Mississippi Lime Co. of Mo., Mo.App., 285 S.W. 2d 46, and properly could have considered the activities of the claimant subsequent to the injury. The award was supported by competent and substantial evidence, and was not against the overwhelming weight of the evidence.

Claimant's last contention is that the commission failed to award him payment or give him credit for a healing period of 20 weeks' duration. The question, oddly enough, is one of both first and last impressions, in that the legislative amendments to Section 287.190, subsequent to the date of this injury, clarify the issue involved. It is not necessary to set out the entire section as the parties agree that on the date of this accident, April 26, 1957, that part allowing a healing period provided: "In addition to the compensation provided in the *schedule of losses,* the employer shall pay to the employee for a healing period * * *", and that this sentence has now been amended to read: "In addition to the compensation in this section provided for *all* permanent partial disabilities, *whether scheduled or unscheduled,* the employer shall pay to the employee for a healing period * * *." Under this status of the law, claimant very forcefully contends that he did suffer scheduled injuries to both upper extremities and qualified for the healing period allowance. That the particular injuries were sustained is evident both from the medical testimony and their apparent consideration by the Commission,

in that it found a 40% disability to the body as a whole with the medical evidence estimating the unscheduled injuries at 10% of the body. The problem is obvious, and any solution must start from the premise that compensation due is dependent on a proper determination by the commission as to the extent of injury. This is a case of multiple injuries to several areas of the body, and could not have been anticipated with accuracy in a statutory schedule of losses nor computed without the commission's ultimate finding as to injury. By necessity, as well as the law established in the case of Dauster v. Star Mfg. Co., supra, the commission had to resolve the question as to extent of injury from the "catchall" provision now in paragraph 3 of Section 287.190, i. e., body as a whole limited to 400 weeks. That many injuries must often be confined in one award, has caused it to be stated, " * * * an injury is not specific within the meaning of a schedule unless such injury relates solely to the injured member, * * *." 71 Corpus Juris, page 838, Section 551, 99 C.J.S. Workmen's Compensation § 310, page 1119. The case of Komosa v. Monsanto Chemical Company, Mo., 317 S.W.2d 396 is helpful. The injury there came under the catchall provisions of the statute, and the employee under Section 287.160 sought interest on compensation payment installments from the maturity date of each. The court held that due to the type injury involved, no automatic computation could have been ascertained, and that interest began as of the date of the award; its significance here emphasizing that all compensation does in fact depend on the ultimate findings of the Commission.

The multiplicity of injury in the instant case required the Commission to determine the extent of injury based on the body as a whole. In doing this it was limited to the allowances provided for unscheduled injuries on the date of this accident. With no statutory provision for a healing period provided, the claim for it was properly denied. Although of no benefit to this

claimant, it is fortunate that this inequity has been corrected.

For the reasons stated, your commissioner recommends that the judgment be affirmed.

PER CURIAM.

The foregoing opinion by MORGAN, Special Commissioner, is adopted as the opinion of the Court.

The judgment of the trial court is affirmed.

ANDERSON, P. J., WOLFE, J., and GEORGE P. ADAMS, Special Judge, concur.

RUDDY, J., not participating.