Curtis **SCHWARTZ**, Appellant,

v.

**SHAMROCK DAIRY QUEEN**,
Respondent.

No. ED 76016.

Missouri Court of Appeals,
Eastern District,
Division One.

June 6, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 17, 2000.

Application for Transfer Denied
Aug. 29, 2000.

Marc S. Wallis, Newman & Bronson, St. Louis, for appellant.

Carol T. Clark, St. Louis, for respondent.

PAUL J. SIMON, Judge.

Curtis Schwartz, employee, appeals the award of the Labor and Industrial Relations Commission (Commission) awarding 400 weeks for permanent partial disability for his scheduled and unscheduled losses pursuant to section 287.190 RSMo 1994 (all further references shall be to RSMo 1994 unless otherwise noted).

Employee contends that Commission erred in concluding that it was limited to awarding employee 400 weeks for permanent partial disability given the multiple and severe injuries sustained by employee, which include both scheduled and unscheduled losses pursuant to section 287.190. We affirm.

■ The facts are undisputed. Labor and Industrial Relations Commission's interpretation and application of the law are not binding on the Court of Appeals and fall within the Court's realm of independent review and correction. *Williams v. City of Ava,* 982 S.W.2d 307, 310 (Mo.App. S.D.1998).

■ At the time of his injury, employee was a seventeen year old high school student employed part-time by Shamrock Dairy Queen, earning $4.35 per hour. At most, he worked eight hours in any given day. In addition, he worked part-time as a bagger/cart control/stocker for National Food Stores. On December 8, 1992, employee was injured in the course and scope of his employment with Dairy Queen when an unidentified assailant entered Dairy Queen, announced a robbery and shot employee. As a result, employee suffered a gunshot wound, a thoracic spine injury resulting in paraplegia, and numerous other injuries.

Employee was initially treated at Christian Hospital Northeast. He was subsequently transferred to St. John's Mercy Medical Center for rehabilitation under

the care of Martin B. Wice, M.D. Dr. Wice determined employee to be at maximum medical improvement on December 8, 1993.

Prior to that time, On July 15, 1993, employee returned to work on a part-time basis for National Foods and recalls making $5.00 per hour. He continued to work for National Foods until Schnucks Markets bought the store in 1995, at which time Schnucks hired him. He earned $8.86 per hour until April 1996 and as of August 21, 1998, he was earning $10.75 per hour. His duties included working in the office of the corporate headquarters monitoring store alarms, providing support for the stores, and filling in for vacationing employees.

Employee finished high school in the fall of 1993 and began attending Southern Illinois University at Edwardsville. As of August 21, 1998, he was pursuing a degree in elementary education, with an anticipated graduation date in December 1998. He continues to reside with his parents, whose home was modified at the expense of the insurer to accommodate his disability. Employee drives a vehicle, which he obtained in 1993. The cost of the vehicle was shared equally between employee and insurer. The insurer paid for the modifications to the vehicle.

On August 21, 1998, an administrative law judge (ALJ) conducted a hearing on employee's claim for worker's compensation. At the hearing, Dr. Lichtenfeld and Dr. Wice testified as to the significance and severity of employee's injuries. Based on the medical history obtained from employee, his examination of employee, and a review of medical records, Dr. Lichtenfeld diagnosed that as a result of and in addition to the gunshot wound, employee suffered from:

1. T6 complete paraplegia

2. Neurogenic bladder with recurrent urinary tract infections

3. Neurogenic bowel

4. T6–7 posterior element destruction with comminuted fracture of the right pedicle of T6 and fragmentation of the lamina and spinous process of T6 and T7, as well as portion of bony fragments noted inside the spinal canal

5. Spinal cord damage at T4 and below

6. Left chest and lung contusion with pneumothorax and hemothorax

7. Status post removal of bullet fragments

8. Status post median sternotomy as well as chest exploration

9. Left lateral epicondylitis

10. Grade 2 coccygeal decubitus ulcers, now resolved

11. Initial hypotension requiring multiple transfusions

12. Right 6th rib fracture

13. Pulmonary contusion

14. Hemothorax

Dr. Lichtenfeld rated employee's permanent partial disability as follows:

1. 100% of both lower extremities at 414 weeks

2. 60% of the body as a whole for neurogenic bladder at 240 weeks

3. 50% of the body as a whole for neurogenic bowel function at 200 weeks

4. 20% of the body as a whole for sexual dysfunction and probable infertility at 80 weeks

5. 15% of the body as a whole for pulmonary contusion, hemothorax, and right sixth rib fracture at 60 weeks

6. 20% of the left elbow for left lateral epicondylitis at 42 weeks

7. 15% of the body as a whole for psychological consequences of the injuries at 60 weeks

Dr. Lichtenfeld opined that employee's injuries combine and concur to form an overall greater disability than the simple sum with a synergistic and multiplicative effect. He further opined that employee will require future medical care for the rest of his life, including the use of wheel-

chairs, modifications of his vehicles and homes, daily supplies, periodic treatment and monitoring, and treatment for increased risk of infection and pneumonia as they occur. He also opined that, medically, the claimant requires a racing wheelchair for both physiological and psychological reasons.

Dr. Wice's diagnoses are substantially the same as Dr. Lichtenfeld's, and he opined that employee suffered a 94% permanent partial disability to the body as a whole from the 1992 accident. Dr. Wice also testified that employee would benefit from the use of a racing wheelchair.

On October 21, 1998, the ALJ found that "the only reason that claimant is not permanently and totally disabled, given the very severe injuries that he sustained, is because of his sheer determination and motivation to be a productive citizen." He further found that, "[employee] should not be penalized in receiving fair and just compensation because he has worked while being a full time student…since suffering his injury." However, he found that "400 weeks is the maximum period payable for permanent partial disability resulting from an injury, and the [employee] is only entitled to one period of disability." As a result, the ALJ found employee's disability to be 100% permanent partial disability to the body as a whole (400 weeks). He awarded employee the maximum rate of $235.61 per week for 400 weeks, totaling $94,244.00. He further found that employee was entitled to compensation of $644.00 in reimbursement of past medical expenses not furnished by employer and he credited employer $9,483.38 for overpayment of temporary disability benefits, resulting in a total award of $85.424.62. The ALJ also determined that employee will require medical care for the remainder of his life and, as a result, awarded him open medical care.

Employee filed an application for review with the Commission on November 9, 1998 with respect to the ALJ's finding limiting the award for permanent partial disability to 400 weeks despite employee's multiple and severe injuries, including scheduled and unscheduled losses. The Commission reviewed the matter and entered its final award on March 11, 1999, affirming the findings and award of the ALJ.

On appeal, employee contends that the Commission erred in concluding that it was limited to awarding employee 400 weeks for permanent partial disability given the multiple and severe injuries sustained by employee, which include both scheduled and unscheduled injuries pursuant to section 287.190. He argues that he is entitled to receive 456 weeks of permanent partial disability for the scheduled losses that he suffered and an additional 400 weeks for the unscheduled losses for a total of 856 weeks plus any increased disability suffered as a result of the multiplicative and synergistic effect of the injuries.

The crux of his argument is that the Commission misconstrued section 287.190. He contends that the Commission determined that the injured employee is not entitled to receive compensation for disabilities that are both scheduled and unscheduled and that the Commission found that it was required to choose between the two in awarding permanent partial disability. He argues that section 287.190 does not limit an injured employee from receiving compensation for permanent partial disability, which is scheduled and unscheduled.

Employee also claims that Commission's reliance on *Dauster v. Star Manufacturing Company*, 145 S.W.2d 499, 502, 503 (Mo.App. E.D.1940), *Chapman v. Raftery*, 174 S.W.2d 352, 354 (Mo.App. E.D.1943) and *Carenza v. Vulcan–Cincinnati, Inc.*, 368 S.W.2d 507 (Mo.App.1963) is misplaced. He argues that *Dauster* and *Chapman* are inapplicable because they were decided prior to 1949 when section 287.190 was amended such that the provisions for scheduled and unscheduled losses were separated. According to employee, prior to 1949 the limitation of 400 weeks

for permanent partial disability applied for all losses, whether they were scheduled or unscheduled. However, he argues that the amended statute only limits unscheduled losses to 400 weeks, but does not place such a limit on scheduled losses because the 400–week limit is only mentioned in the provision for unscheduled losses. He contends that *Carenza* is not precedential because, according to him, the court did not address whether employee has a right to receive both an award for both scheduled and unscheduled losses and merely referenced the language that limits unscheduled disability to 400 weeks.

Currently, permanent partial disability is awarded pursuant to the provisions set forth in Section 287.190, entitled Permanent partial disability, amount to be paid – permanent partial disability defined, which provides in pertinent part:

1. For permanent partial disability, which shall be in addition to compensation for temporary total disability or temporary partial disability paid in accordance with sections 287.170 and 287.180, respectively, the employer shall pay to the employee compensation computed at the weekly rate of compensation in effect under subsection 5 of this section on the date of the injury for which compensation is being made, which compensation shall be allowed for loss by severance, total loss of use, or proportionate loss of use of one or more of the members mentioned in the schedule of losses.

\* \* \*

2. If the disability suffered in any of items (1) through (29) of the schedule of losses is total by reason of severance or complete loss of use thereof the number of weeks of compensation allowed in the schedule for such disability shall be increased by ten percent.

3. *For permanent injuries other than those specified in the schedule of losses, the compensation shall be paid for such periods as are proportionate to*

*the relation which the other injury bears to the injuries above specified, but no period shall exceed four hundred weeks, at the rates fixed in subsection 1.* (Emphasis added). The other injuries shall include permanent injuries causing a loss of earning power. For the permanent partial loss of the use of an arm, hand, thumb, finger, leg, foot, toe or phalange, compensation shall be paid for the proportionate loss of the use of the arm, hand, thumb, finger, leg, foot, toe or phalange, as provided in the schedule of losses.

\* \* \*

Prior to its amendment in 1949, section 3315(a), R.S.1929, the predecessor to section 287.190, provided:

For permanent partial disability, in lieu of all other compensation, except that provided under section 3311 of this chapter, the employer shall pay to the employee 66 ⅔ per cent of his average earnings as computed in accordance with section 3320, but not less that six dollars nor more than twenty dollars per week, for the periods hereinafter provided:

\* \* \*

*For permanent injuries other than those above specified, the said compensation shall be paid for such periods as are proportionate to the relation which the other injuries bears to the injuries above specified, but no such period shall exceed four hundred weeks.* (Emphasis added). Such other injuries shall include permanent injuries causing a loss of earning power. The total, permanent loss of the use of an arm, hand, thumb, finger, leg, foot, toe or phalange and compensation shall be paid for the same period as for the loss thereof by separation. For the permanent partial loss of use of an arm, hand, thumb, finger, leg, foot, toe, or phalange compensation shall be paid for the proportionate loss of the

use of such arm, hand, thumb, finger, leg, foot, toe or phalange...

* * *

A review of sections 3315(a), R.S.1929 and 287.190 reveals that the language of section 287.190.3, the unscheduled loss provision, is identical to that found in the pre–1949 statute. The essential difference in the current statute from the pre–1949 version is that the legislature separated the scheduled loss provision from the "other injury" or unscheduled loss provision. Also, in 1949, the scheduled loss provision was changed so that it referred not just to the loss or complete severance of a limb, but to also deal with the proportionate loss of a limb or any multiple injury. *Sapienza v. Deaconess Hosp.*, 738 S.W.2d 149, 152 (Mo.App. E.D.1987). As a result, under the 1949 statute, there are fewer injuries that fall into the unscheduled or "other injury" provision. *Id.* Subsequent cases continue to recognize this principle and give deference to the Commission in arriving at an appropriate award. *Id.*

*Dauster* and *Chapman* were decided prior to the 1949 amendment. However, since the language of the pre–1949 provision, limiting permanent partial disability awards to 400 weeks, is identical to the language now found in section 287.190.3 and section 287.190, as a whole, remains substantially unchanged from its predecessor, those cases remain instructive on the interpretation of the statute.

In *Dauster*, this court addressed the issue of whether section 3315(a), R.S.1929 limits the award for permanent partial disability to 400 weeks in a case where an employee suffers multiple injuries in a single accident. See *Dauster*, 145 S.W.2d 499. In interpreting section 3315 this court focused in part on the following provision:

> For permanent injuries other that those above specified, the said compensation shall be paid for such periods as are proportionate to the relation which the other injury bears to the injuries above

specified, *but no such period shall exceed four hundred weeks.* (Emphasis added). Such other injuries shall include permanent injuries causing a loss of earning power. *Dauster*, 145 S.W.2d at 501.

After deciding that the foregoing provision was intended as a "cover-all" for injuries other than those specified in the schedule of losses, this court held:

> The period is to be fixed in such proportion to the relation which the other injury [unscheduled loss] bears to the injuries specified in the schedule; not in proportion to the arbitrary periods of payment provided in the schedule for a single injury, but in proportion to the relation which one injury bears to another injury when both injuries are the result of the same accident. And after thus considering the relation that the one injury bears to the other injury, the Commission is restricted to a period of compensation for 400 weeks. *Dauster*, 145 S.W.2d at 503.

In *Chapman*, the employee sustained multiple injuries in a work-related fall, including fractured vertebra, left heel bone, right tibia and right fibula extending into the ankle joint. *Chapman*, 174 S.W.2d. at 353. The insurer appealed the award, contending that the employee's injuries should be rated by calculating loss in relation to the loss of a leg at the ankle and to the loss of a leg at the knee, but omitted all consideration of the employee's back injury, which it treated as being wholly without disability. *Chapman*, 174 S.W.2d at 353–354.

Relying on *Dauster*, this court held:

> Where there are combined or multiple injuries resulting from one and the same accident, the compensable period is not necessarily to be fixed with regard for the relation which each and every one of such multiple injuries may bear to some one of the specific injuries mentioned in the statutory schedule, but that instead the commission, in such a case, may

properly fix the period in relation to the maximum period of 400 weeks, considered from the standpoint of the percentage of disability on the normal functions of the injured man himself. *Id.*

Thus, it is clear that an award of 400 weeks was the maximum permitted by statute for permanent partial disability prior to 1949.

The schedule of losses is found in section 287.190.1 and the unscheduled loss provision is in section 287.190.3. Although separated, section 287.190.3 refers to the schedule of losses section. The first sentence of 287.190.3 provides that "[f]or permanent injuries other than those specified in the schedule of losses, the compensation shall be paid for such periods as are proportionate to the relation which the other injury [unscheduled injury] bears to the injuries above specified [in the schedule of losses], but that no period shall exceed four hundred weeks, at the rates fixed in subsection 1 [the schedule of losses]."

■ Section 287.190 does not preclude an employee from receiving compensation for permanent partial disability, which includes both scheduled and unscheduled losses. However, the period of compensation for the body as a whole is 400 weeks. See *Chapman,* 174 S.W.2d. at 353–354. It follows that an award for permanent partial disability may not exceed 400 weeks. Section 287.190.3 clearly establishes this limit and a review of the case law supports such a conclusion.

In *Carenza,* a case decided after the 1949 amendment, an employee suffered multiple injuries in a work-related fall, including both scheduled and unscheduled losses. The employee argued that his injuries should be rated by calculating the percentage of loss for each individual injury, rather than calculating the loss as a percentage of his ability to work and function as a normal man. Recognizing that this was essentially the same contention raised in *Dauster,* this court held:

*Carenza* was a case of multiple injuries to several areas of the body, and could not have been anticipated with accuracy in a statutory schedule of losses not computed without the commission's ultimate finding as to injury. By necessity, as well as the law established in *Dauster,* the commission had to resolve the question as to the extent of the injury from the "catchall" provision now in paragraph 3 of Section 287.190, i.e., body as a whole limited to 400 weeks. That many injuries must often be confined in one award has caused it to be stated, * * * an injury is not specific within the meaning of the schedule unless such injury relates solely to the injured member, * * *. *Carenza,* 368 S.W.2d at 514. This court further held that the multiplicity of injury in *Carenza* required the Commission to determine the extent of injury based on the body as a whole and in doing so, the Commission was limited to the allowances provided for unscheduled injuries on the date of the accident. *Id.*

In *Sapienza,* a case involving multiple injuries arising from the same accident, including both scheduled and unscheduled losses, this court, in dicta, recognized that 400 weeks is the maximum award allowed by section 287.190.3. See *Sapienza,* 738 S.W.2d at 151–152.

Thus, a review of the section 287.190, its predecessor and the relevant case law clearly reveals that the amendment to section 287.190, separating scheduled losses from unscheduled losses, did not have the affect which employee espouses. The language of the statute remains essentially unchanged and, in cases involving multiple injuries resulting from the same accident, section 287.190 has consistently been interpreted as limiting permanent partial disability awards to 400 weeks.

Here employee suffered multiple injuries from a gunshot wound, inflicted by an armed assailant, while he was working at Shamrock Dairy Queen. His injuries included both scheduled and unscheduled losses. While we agree that he should not

be penalized in receiving fair and just compensation for his disability because of his sheer determination to work and be productive, we are bound by the statutory provisions. Naturally, any change in the statutory provisions must be made by our legislature. Point denied

Award affirmed.

GARY M. GAERTNER, P.J., JAMES R. DOWD, J., concur.